Thank you. My name is Jim Bobb. I'm the attorney for the plaintiffs below. Shortly after the petitions began to be circulated seeking to put R-71 on the ballot, several groups announced that once the petitions were submitted, they would be placed on the Internet in a searchable form. These same groups had done this after the passage of Proposition 8, and as a result, numerous acts of harassment were reported against supporters of Proposition 8. The result in Washington was that the people who were going to sign the petition felt threatened, and many refused to sign. Supporters of gay marriage opposed this move, saying that it was hostile and an attempt to intimidate people. The Seattle Times called it intimidation, plain and simple. This resulted in this case seeking to prevent the public disclosure of the R-71 signers. Now, the plaintiffs below were entitled to a harassment exception against disclosure of the R-71 signers. The harassment exception to disclosure should be granted, as the Court said in Buckley. When you say the harassment exception, what are you talking about? Is that a statutory exemption? It's one required by the First Amendment according to the U.S. Supreme Court in Buckley v. Vallejo and also repeated in Doe v. Reed. And that's the one that the district court construed as applying only to fringe groups or something like that. Yes, it is. And they were erroneous in that in that construction, as I will soon mention. Well, before you get there, you know, what's worrying me and I think this is speaking for myself, you know, before we get to merits. Well, as to mutinous, there are effective remedies that the court could offer. For instance, the two groups that receive these names and place them on the Internet are parties to this litigation. They could be ordered by the district court to take down those names. Furthermore — Well, just a minute though. Are they the only ones that have put these on the Internet? The only two that I know of. The only two? That I know of. Are the two plaintiffs here. They were the ones that made the request. You mean the two intervener defendants. Yes. They could be ordered to take it down. And furthermore, this is capable of repetition but escaping review. Right now, the plaintiff here, Protect Marriage Washington, is supporting the circulation of petitions regarding Initiative 1192 that also involves the gay marriage issue. So they are involved in — would be involved in the question with respect to that initiative of whether or not those signatures could be publicly released. Mr. Bopp, it was interesting that in the State's response to your renewed emergency motion for a preliminary injunction, which we reviewed without having a hearing, the State cited Messick, the case in which they deal or in which they rely now, the 11th Circuit case, and they suggested there's no effective remedy available. You didn't say anything about that then. You didn't even respond to that. You now attempt to distinguish this in your reply brief. Why didn't you make these arguments when we had that motion in front of us? Isn't the horse out of the barn? I mean, my worry about this is that you had Messick clearly in front of us. You had all the arguments you're making now that it doesn't make any difference. But you didn't say anything. And we went on the record, at least two of us, saying this is moot or close to it if it isn't, and one saying, well, it sure will be if you don't stop this foolishness. And it went to Supreme Court, and they didn't do anything about it. Haven't you lost your chance here? Well, the horse was out of the barn because of what the district court did, was to sua sponte, disclose the names, without hearing, without notice. And, of course, one of our claims is that that violated due process. Well, I understand what your claims are, but you didn't answer my question. Why didn't you say something about these arguments against Messick then? Why is it I'm just getting them now? Your Honor, I don't know. I don't know why that decision was made as to that particular point. I mean, it seems to me, now, I'll be fair, given Messick and given the arguments about Messick, I got the idea from what you'd done that you didn't really want to talk about that. Well, that's not true. Now you want to talk about it. Well, if we thought it was pertinent and within the space limit and time limitation, it was appropriate, then we would have done it then. It wasn't we're hiding from it. I mean, you know, it's very difficult to address all the issues that might come up when you're in an emergency situation like we were. I mean, they had summarily, sua sponte, released all the information without notice, and we were trying to get here as quickly as we could, understanding that because that was done, you know, people were thinking that that might have jeopardized our case. Now, I also point out, Your Honor, that as to the movements issue, there's also capable repetition but escaping review. But nobody said anything about that in the first hearings we've had. Nobody said anything about that by you. And now here I am stuck with a new idea or a new argument, and I guess I'm trying to figure out what I'm going to say to my colleagues because you know I dissented. Those facts regarding capable repetition had not arisen. Right now there's an initiative, initiative 1192, that is being circulated in Washington to be placed on the ballot this year. Those facts hadn't occurred a year and a half ago. Well, but isn't it true, even if we get to your capable of repetition argument, that your failure to timely move the district court to stay its order pending appeal allowed the disclosure which might otherwise have been enjoined? That is not true at all. We filed that as quickly as humanly possible, and they had already released them. As soon as the order was entered, the secretary of state sent out the disks. Within minutes of it being released. But it seems to me if one would have been worried, one might have said, if you're going to do anything about this, seal this order. If you're going to do anything about this, redact from what's on this order what's on there. There was absolutely no indication by the court. It was not briefed or argued by anybody. That's the problem I have, is not that it's briefed and argued, that you would have said and made it be briefed, made the motion, done what needed to be done. I didn't think anything needed to be done. We were entitled to notice under the rules of the release of this information. We had a protective order. Protective orders cannot be sua sponte vitiated. They can only be done by then, we cite this in a footnote, when you have a stipulation of the parties or when there's a motion, or when the court says that it provides you an opportunity to contest it. It cannot be done sua sponte, and it was done sua sponte. So we assumed that the law and the rules would be followed. Let's go one further. Here, all of the third parties that now have access to the petitions are not before the court. That's true, all of them are not. And there's no way to prevent them from further disseminating the identities. Just like the grand jury transfers. So will a ruling from this court really do anything to narrow that dissemination? Sure, you can order the parties, the people that are parties, that are posted on the Internet to take them down. I mean, you can't do everything. And just like in the grand jury transcripts are released, they couldn't do everything. They couldn't affect every body that had it, but they could offer some effective relief. And having that taken down would be effective. But furthermore, this is capable of repetition, but escaping review. Mr. Boff, to address that element for a minute, or that doctrine, there are two elements. The first is that in effect, you know, the it has to be the type of case where the duration of the probable or alleged violation is so short that there isn't time to fully litigate the matter. Yes. But that means to the Supreme Court. But most of those cases involve things like high school graduations, you know, things like that. But in this case, seems to me an argument can be made that you fail on that ground because the reason it evades repetition is because as some of Judge Smith's questions intimated, the evasion of review resulted from your lack of lack of timely action. No. You know, it's one time. This was this was several years before before these things got out to the Internet. What could you have taken? What could we have done? Well, you could have filed a prompt motion in the district court for a stay. We did. It was already there. It had already been sent out the disks. We did. We did within 24 hours. And it may have been the same day. I don't recall. Well, you know, when I was sitting as a district judge, I remember many cases when that kind of situation comes up, the lawyers standing at the lectern and he or she, you know, had the motion ready. Well, at the end of the at the end of the hearing saying, well, just in case the court rules against me, I want to move at this point for a stay. You didn't do that. No, no. We assume that the rules will be followed regarding. Well, what's the rules that wasn't followed? We thought we cited the rule in in our brief, and that is a protective order cannot be listed, lifted unless there is a stipulation by the parties. Well, you didn't lift the motion or there is a. If this is judge wanting to do the judge settle, the judge settled expressly lift the protective order. I don't think so. You see, you know, that's a good point. I think you're right. He just released him in violation. No, no, no, no. He entered judgment, which means, you know, a protective order is only an interim measure while the case is pending. I don't believe that's true. That's a usual case. Can you cite me a case that's not true? No, because I never heard of that proposition. I don't know. That's what it is to keep to keep the status quo in dependency of the action. No, that's a preliminary. All right. But anyway, not a protective order. All right.       All right. All right. All right. All right. All right. So that's a prong one of the capable of repetition. Now, the second is the reasonable expectation that the same injury would befall the complaint in this case. Now, as I understand it, well, I don't know about the individual parties. No, we don't want to go to. But P.M.W. when wouldn't face this again. Well, in other words, the proponent of. Yes, there's some initiative right now. Well, supporting it is not the same as, you know, being the sponsor. But the sponsor of this new initiative is not P.M.W. right. The sponsor is not being to somebody else. So. So. So P.M.W. is not facing the same situation again as it did the last time. It's a sponsor. They are not in the position of the spot of a sponsor, but that's not material. Well, why not? Because they're supporting the initiative. Well, that's it. Isn't that what gives them standing? And they are they are themselves circulating the petitions as they have explained. And, you know, their ability to circulate the petitions are inhibited by the threat of disclosure of those people's names. Well, there's nothing in the record to that effect. In fact, the petitions are already qualified, isn't it? I'm sorry? The petition is already qualified. It is already qualified, but the name. So there aren't so no one circulating anymore petitions. Well, you know, in Wisconsin right to life, the court said the case was a moot not because of the technicalities you're pointing out, but because the Wisconsin right to life said that they were going to be doing something material in the materially similar in the future, as the plaintiff here has alleged in its complaint. So this isn't the only initiative that they've ever supported. They will be supporting others in the in the future. And that was sufficient. Wisconsin rights like those unanimous ruling on the mootness issue. So your case is that if the plaintiff in this case protect marriage supports future initiatives, that's sufficient. Doesn't have to be the primary sponsor. Yes, because they are associating with a with a group for the same purpose. I mean, let me move us past the mootness argument to standing. It's my understanding from reading your brief that you're suggesting that PMW has associational standing, right? One of the elements. What other standing did you allege they have already? Where did you do that? I read Blue Brief 51. And it seems to me that the only thing you've argued for protect marriage. Washington is associational standing. Where do you where do you would you cite me where you say anything about third party standing? I'll see if I have it here before me. I may. OK. On page 20, we cite associational. What's the what's the Blue Brief 20? Yes. For. Oh, actually, I'm sorry. That is the reply brief 20. And right before then, on page 19. Looking at the reply brief. Really looking at your brief you sent to me in the Blue Brief. I don't have that in front of me. Well, I looked through your Blue Brief and I couldn't find anything except associational standing doctrine. In fact, I even have the language here. And so I wanted you to kind of put me out because if I'm going to look to third party standing, it seems like the only ones you really go for are the two plaintiffs, John Doe one and two. Those are the two that it was alleged on behalf of. Yes. All right. I want to make sure. I want to make sure that I understood that. OK. Yes. And associational standing as to BMW. All right. Thank you. Now, if it's associational standing, then. And that's all we've really got in front of us. I guess I'm having a tough time with how to reconcile that with Hunt. But the association only has standing to bring the suit on behalf of its members when certain requirements are met. I don't think these are members of the BMW, are they? Well, I didn't know if BMW has members. It doesn't have any members. So I'm trying to figure out how I can give it associational standing. Because the Supreme Court protects this sort of association. When people join in a common cause, they don't have to technically be a member like being paying dues. Well, they can be supporters. I guess I'm going to look for your best case on that. I didn't find one. I found that in Mank the association was a government organization. I looked at Fleck and I couldn't find it. I looked all over from some case that said there was some associational standing simply because a private association was doing something for them. And I couldn't find it. Really? I can't cite you one off the top of my head. All right. I just wanted to make sure about that because I think that's kind of important. Well, that doesn't help much because I don't remember the cases that I've reviewed that address that issue. Buckley certainly addresses the fact that association or the rights of association apply to supporters. It addresses it itself on page 64 of Buckley. I mean, it don't have to be technically members. Well, I'm having a tough time understanding why Buckley says that, but I understand your argument. So I'll look at Buckley again. Good. Thank you. The finding that the district court made on page 34 entitles the plaintiffs to the harassment exception. That finding was that the plaintiffs have developed substantial evidence that the public advocacy of traditional marriage as the exclusive definition of marriage or the expansion of the rights of same-sex partners has engendered hostility in this state and risen to violence elsewhere against some who have engaged in that advocacy. The court below further found on pages 17 and 18 that the plaintiffs presented a, quote, or retaliation against the supporters of Proposition 8. And, of course, under Buckley and Socialist Workers v. Brown, when an organization is new, such as this group was new when it initiated this initiative, that you can use examples from other states of people and organizations that express similar views. What if we find it not new? Huh? What if we find it not new? You got any? I think you still are. I think the relevant evidence is what the court said in that passage. Well, but just a minute. Supposing that I look at that passage and I look at your case and I say to myself, here's this situation where these people filed this action. We had all kinds of fights about it at first. It went all the way to the Supreme Court. The stuff got out. Everybody now knows about it. And it comes back. And I got no evidence suggesting that those who signed privately were intimidated. How could that possibly be? Where's the evidence that those who signed privately were intimidated? There cannot possibly be such evidence. Nobody knows about it. Well, they've known about it since my colleague said this was moot and we sent it on to the Supreme Court because then everything came out. Oh, you mean you're talking about after the release? Yeah, yeah. Okay. After the release, there was no campaign like there was with respect to Proposition A to harass these people. No, there was no evidence after it was released by the district judge? There was no evidence of any campaign like the campaign that occurred after the release regarding Proposition A. In other words, this occurs because there's a campaign. The people get on the Internet and through other means urge people to have, quote, uncomfortable conversations with these people. There was no campaign. When you say a campaign, you're talking about the campaign to get the initiative on the ballot? No, no, no. A campaign of harassment. In other words, where people or groups or individuals advocate harassing them and say go to the Web site. Well, when does that campaign happen? Before the vote on the initiative? No, that campaign happened with respect to Proposition A after Proposition A was passed and after the supporters were, the contributors were posted on the Internet. Well, we're not talking about Proposition A here. We're talking about your proposition. Yeah, and I was contrasting that here because there was no similar campaign to try to get people to harass the signatures of R-71. It was at that point they decided for whatever tactical or strategic reason not to initiate a campaign of harassment in that case. So, you know, people react to people advocating you to do things. There were advocates of a campaign of harassment that resulted in over 260 documented instances of harassment regarding Proposition A. There was no similar campaign this time for whatever strategic or tactical reason. Well, I guess my worry is this. When I read what the Supreme Court said in our case, Justice Stevens and Justice Breyer were pretty straight. They said only threats or harassment directed at those who sign the petition and that are not speculative as well or indirect are what we look at. That's ridiculous, honestly. You're saying it's ridiculous what they said or that they said it? No, no, that that would be the standard. I mean, that no one knows about private signings. Well, but I guess that's my trouble in this particular case. I've got Brown, which is straight on the books, and I got Buckley that says a new group with no history. And we seem to be in the middle. We got the group. We've got people who signed who came out public. You can talk about evidence about that. Then we get the, if you will, disclosure of all the names. And I got no history of any harassment, threat, anything. Because there was no campaign to initiate. Well, how do you know this? Because it's not in the record. Because it didn't occur? Well, Mr. Bob. Because it didn't occur. But Mr. Bob, if you agree that no campaign of harassment occurred. Was initiated. You're essentially conceding that Judge Settle's findings were correct, that there is no evidence of harassment, right? I didn't. Nope, nope. That's not at all what I said. What's the difference? I said, well, there's a difference between occurred and initiated. And there's a difference between the timing. You said there was no similar campaign of harassment in this case. That's what you said. No. That was initiated. Initiated after the release of the information. If it's not initiated, it can't be ongoing. It can't happen. I don't even understand the question, sir. Well, you said there was a difference between initiating and occurring. Is that what you said? Harassment occurred against every person that was publicly identified with the circulation of R-71 petitions in Washington. Now, so we know that. So how many people is that involved? Very few. Maybe a half dozen who were publicly identified. These people were publicly identified. Yeah, as either the proponents, you know, the heads of the organization or prominent supporters like a preacher was identified publicly. And in each of those instances, it seemed to me that they were mitigated by law enforcement measures. Nothing was done by law enforcement. They took the report, but they didn't do anything. Well, the reason I ask you about that, and I'll look at the record again, seems to me, again, Stevens and Sotomayor, and I'm trying to read what the Supreme Court's going to do here, said, there'd have to be a significant threat of harassment directed at those who signed that cannot be mitigated by law enforcement measures. Stevens off the court. You don't have to count him anymore. Well, Sotomayor, well, I don't think, I frankly don't believe that the new one on the court's better for you than he was. And then Sotomayor, it says, Sotomayor says it requires a showing of serious widespread harassment that the state is unwilling or unable to control. You've got one opinion by one judge, and that is certainly her opinion. The majority opinion did not address any of that. They addressed the standard, which was the same standard as they had adopted in Buckley. So there's no indication by the majority of the court that they accept this extremely restrictive standard that's being advocated. Well, I guess let's look at that again, Mr. Buffett. How about Leto? Just a minute. He's on the court. He is on the court, and I can tell you what he said. I'm just trying to say I have to show a reasonable probability. And in defining what the word reasonable probability is, it seems to me there's a pretty good indication they don't think there's reasonable possibility unless there can't be a mitigation by law enforcement. You know, Leto is much more likely to be in the majority in this court on campaign finance than Sotomayor, and he has a completely opposite opinion. He's the only one who cited me on the mootness. He's the only one who took my position on that argument. Well, then that's even more credit to the court. Well, I don't know whether that's credit. I'm not trying to say what I think. I'm trying to read what the Supreme Court thinks. Well, I understand, but I think the best source for that information is looking at the cases that have actually been decided by a majority of the court, such as Brown. And they take into account other organizations and individuals that are expressing similar views. Buckley says the standard of proof has to be, quote, flexible. And they specifically condemned the idea that it would be a restrictive standard of proof. And the reason was is that they were trying to give protection to the ability of groups to be willing and not chilled or and thereby inhibited from participating in the marketplace of ideas. That was the purpose of it. And therefore, the standard of proof flows from that, from effectuating that purpose. And that's why it makes no sense to say that it has to be a fringe group. I mean, that is simply misreading Buckley. Buckley said the exemption is available to, quote, minor parties. That was a description of the minor political parties, the libertarians that were claiming the exemption, as opposed to the major parties, which were the major political parties, the Republican Party, that didn't make that claim. Counselor, I think you've answered my question. Your time's gone. All right. Thank you. The presiding judge wants you to have more. Thank you. Anything else to say? No. Thank you. May it please the Court. My name is Ann Eagler, and I'm a deputy solicitor general appearing on behalf of the State of Washington's Secretary of State, Sam Reid. And with me at counsel table is William Stafford, counsel for intervener Washington Families Standing Together. In this case, the court held, the Supreme Court held, that the state has an undoubtedly important interest in disclosure, and that this is overcome only when there is a showing of a reasonable probability of threats, harassment, or reprisals that will impair the group's ability to associate under the First Amendment. The plaintiffs have failed to meet that burden, and the case is now moot. Turning first to the threshold issue of mootness, the only relief requested in this case was that these petitions remain confidential. But they were disclosed in October of 2011 when the district court lifted the injunction. At that point, they were posted on the Internet, not by the intervening parties in this case, but by a whole host of those who received the documents. And they were posted not just on two websites, but on many. And a large sampling of those websites, not a complete list, is found at page 10 and 11 of our brief in footnotes 2 through 5. Those petitions are now available to anyone who goes on the Internet in exactly the same format that the Secretary of State releases them, and they're also available in a searchable database. So what do I do with Church of Scientology versus the U.S., where it says here that just because the court enforced the IRS summons seeking the tape recordings, which was enforced before being appealed, that the Ninth Circuit inappropriately, bothers me when they aim right at me, the Ninth Circuit inappropriately determined the case was moot because there was also injury caused by the government's continued possession of those materials, which itself constituted an affront. Your Honor, I understand what you're saying. You're pointing to a number of cases, actually, where the court has found that there is some relief that can still be provided after partial or even full disclosure. In those cases, there is relief in the ability of the court to prevent the use of those materials in future litigation. For example, the federal rules require that the government get the permission of the court before using grand jury materials in a subsequent case. Well, I stayed away from grand jury, because I see that grand jury is just a little bit different. So that's why I went to Church of Scientology. I guess I'm looking at those cases which are outside the grand jury context, because I think the court has, if you will, a little added responsibility in grand jury context, in that in grand jury context, it's secret. And once out the door, it doesn't make it ought not be secret. The court has to have an ongoing approach to make sure things are secret. But I'm looking at cases where the court doesn't have such a responsibility. I'm looking at cases like, well, you cited one, sales, where there's just that there might be something in the future. Now, I'm not a big person. I don't like this nebulous moot idea. But as you can tell by my dissent, but it seems to me that when I look at sales, I look at Scientology, I have a tough time saying that I can say that this is moot. In both of those cases, Your Honor, the court was looking to whether there was some form of relief that the court could provide. Was there some party there that the court could order to behave in this specific way? Well, I can order both of you to behave that are sitting here in front of me. Absolutely, Your Honor. You do have the power to enjoin the State of Washington from disclosing the petitions. But to what end? No relief would be provided, because those names are still on countless websites, and that grows every day. Well, just a minute. Now, that goes to Mr. Bopp's statement that, in fact, it's only the two intervenors that have put these on the website. So if we ordered the intervenors to take down their website, that would grant him partial relief. Mr. Bopp is mistaken, Your Honor. The intervenors have not posted anything on the Internet. The postings have been by others who requested the petitions, and they are on numerous websites, as noted on pages 10 and 11, footnotes 2 through 5 of our brief. So ordering the intervenors to do something does not achieve any goal either. The material remains disclosed for the public to find on media, newspaper websites, on private blogs, and on a website that has made a searchable database that people can go to to search for names of those in their community or neighborhood that signed the petitions. Let me ask you this. If I'm doubtful about my ability to offer an effective or meaningful remedy, just doubtful, can I nevertheless address the merits? If you believe there is some form of relief to be granted, then certainly you can look to the merits, Your Honor. And in that case, the plaintiffs have failed to meet their burden of proof on the merits, the burden to show a reasonable probability of threats or harassment or reprisals that impair their ability to associate. During the pendency of this case, for two years before the district court considered this case, the names of over 850 of Protect Marriage Washington's donors were publicly disclosed on the State of Washington's public disclosure website. So the district court had a full body of information before it. There was no evidence brought forward that any of those publicly disclosed donors suffered any threats, harassment, or reprisals. And as for the petition signers, they, too, could have been a rich source of information about harassment if any had occurred because the signings didn't happen exclusively in private locations. On the contrary, Protect Marriage Washington's witnesses testified that they went to the most public places possible to get these petitions signed. They went to Walmart parking lots. They went to huge community gatherings. These petition sheets are on 11-by-14-inch paper, and they contain multiple lines. Usually multiple sheets are there on the tables as well. And as they called people up and asked them to read those petitions and consider signing, anyone could see the names and the addresses of the other petition signers. And yet again, even though Protect Marriage Washington's primary leader testified that he took the e-mail addresses of the signers and sent out e-mails asking people to please share stories of harassment or threats they experienced while publicly signing or afterward, they offered no such testimony. There is no evidence here of threats or harassment to the relevant group, those who supported Protect Marriage Washington. What was offered was testimony about a handful of people that were the very public sponsors and endorsers of the initiative. And even with respect to them, the evidence showed limited instances of rude gestures and remarks. Let me ask you, are you defending Judge Settle's idea that we've got to have a minor party here? Absolutely, Your Honor. That is part of the reasonable probability test. As the court stated in Buckley. Where in Buckley do I find that? I would point you to. Buckley says the First Amendment requires an exception for groups that show reasonable probability, but it doesn't state any place that the party must be a minor party. Your Honor, on pages 74 and 75. It says there might be easier for a minor party. On pages 74 and 75 of the Buckley decision, the court states that with a minor party, the fear of reprisal may deter contributions to the group to the point where the movement cannot survive. So in other words, with a minor party, it could be easier. But it doesn't say you've got to be a minor party. I don't find any case from the Supreme Court at all which says you've got to be a minor party. I do find the language you've cited me that says with a minor party, it might be easier to make it. But it doesn't say you've got to be one to make it. Well, Your Honor, I would disagree. I believe the Supreme Court has focused in Buckley and in Brown v. the Socialist Workers' Party on the context in which these cases come up. And that context is the First Amendment. And the question is, is the ability to associate threatened? And as the court stated in Buckley, with a minor party who's unlikely to win an election, who may be crippled to the point of being unable to survive, the state's interest in disclosure is decreased and the group's interest in confidentiality is increased. That language is repeated again in the Brown v. Socialist Workers' Party case where the court states at page 98 that with respect to a minor party, exposure may cripple the party's ability to operate. If we expanded this exemption and applied it to any group that experiences threats and harassment, then President Obama's campaign is entitled to an exemption from disclosure. Well, it might be a minor party. I think that that would be virtually impossible to show. I'm just throwing that out. He may well lose the election, Your Honor, but he has previously won an election. He has a very wide base of power. Well, I didn't say that for you to answer it. I'm just saying I'm having a tough time. You find me the case that says it's got to be a minor party. I'd be glad to look at it. But I found minor parties might have it easier, but that doesn't mean they're the only. You're right, Your Honor. The court stated in Buckley, in fact, that it's not going to put in place a blanket exemption for minor parties. So there's no test of how many members do you have, how many donors do you have, a bright-line rule that the court can apply. All right. I've heard your answer on that. What about Judge Settle's idea that you can't look at evidence outside of these particular parties? It seems to me that Buckley really does talk about a new group that has no history upon which to draw and that they can then offer evidence of reprisal and threats directed at individuals and organizations holding similar views. If I look at Brown, they've got more than two years. They said, bring them in. If I look at, in fact, in Brown, it's four years, and they looked at neighboring states. If I look at what Justice Alito has said, he said, California's Prop 8 provides strong support for an as-applied exemption. That's in my very case. So why did Judge Settle throw all that out? Because, as you noted, Your Honor, Buckley says that we use a flexible standard when it is a new party with no history. That's not what we have here. Protect Marriage Washington had two years of history of having 800 cases. In Brown, they had four years. And in Brown, Your Honor, the Court did not ignore the history in Ohio. What the Court did was state the general hostility that that party had experienced nationwide and then narrowed it down to the State of Ohio. They specifically found, after noting that people had lost jobs, that four of those people were in the State of Ohio. When they made a notation that the FBI had infiltrated this party and was, in effect, spying on them and interfering with the group, they noted specifically that that infiltration was occurring in two major cities in the State of Ohio. They noted that the party headquarters had been – had shots fired upon it in the State of Ohio. The Court certainly did not ignore the relevant evidence to go outside that body of experience. Rather, they noted that this hostility was occurring nationwide. Here, Protect Marriage Washington is asking you to ignore the relevant information in Washington, the lack of any threats, harassment, or reprisals, and instead – Yeah, but you submitted there wasn't any lack. There was just lack since published. I mean, we had plaintiffs receiving angry phone calls. We had people being confronted in public places. We had people taking pictures of them and posted on the Facebook. They received vulgar notes. They were pushed and yelled at with expletives in public. They had garbage thrown on them. They had their children threatened. They're called fascists. I'm just reading my list I wrote. And some even had death threats. These were the ones that were public. Your Honor, these were the people that were public, one. And number two, I would implore you to look at the record instead of just that list and look to see does the record back up those threats. It sounds quite dramatic to say that assault was committed on a child. But looking behind that news clip that you've been provided in Protect Marriage Washington's brief, what happened is that after the R-71 election, a woman who had been a candidate in one city was at a convention in a city 100 miles away. And as she was preparing to leave, her 14-year-old boy was in a parking lot. There was nothing about him or at the convention that had anything to do with Referendum 71. The election had already occurred. Someone drove by in a car and threw out a snack pack-sized container of applesauce, and some applesauce got on the child. The ability to link this to Referendum 71 and say that it is harassment caused by that referendum is, frankly, ludicrous. With respect to the death threat that supposedly occurred. So you're really not arguing, as Judge Settle would suggest, that the public supporter could never present the relevant evidence? I'm not so arguing, Your Honor. There is the most relevant evidence is those who are seeking theoretically to have their associational rights protected. The contention is that those who signed are to be protected. And that test, that relevant focus, shows up not just in the concurring opinions in the Supreme Court's order in Doe, but also in the majority at page 2821. And I'm quoting, The question, indeed, is whether such disclosure in general violates the First Amendment rights of those who signed the referendum petitions. So the relevant evidence here is threats to those who signed and other evidence such as public disclosure of the donors. Did those who merely contributed $25 to the campaign or more experience any threats or harassment? If those who had been public, if we had a record where everyone who stood up in public and said, I'm with Protect Marriage Washington, I have the same traditional marriage view, was shot, and as a result they were able to show that people would not donate to this campaign, would not sign the petitions, then they would be moving toward meeting the standard and would be able to show that they were a fringe organization that had its ability to associate impaired. It seems to me that what you and Judge Smith have been discussing illustrates the truth of Justice Scalia's statement that, and nothing more, that requiring people who stand up in public for their political acts fosters civic courage without which democracy is doomed. In other words, there is going to be some give and take in the electoral process. But the question is, you know, has the line been crossed? And in that regard, it seems to me Judge Settle's ruling on this summary judgment record really doesn't depend on whether or not PMW or the supporters of R-71 are a minor party. He mentions that, but I don't think he connects it to his ultimate conclusion, does he? In other words, it's not dependent on that. I don't think Justice Scalia does, no. No, we're talking about Judge Settle. I mean, Judge Settle in his summary judgment doesn't connect the minor party, I'll call it doctrine, as a requirement to his ruling that there was no showing of substantial harassment here. Is it dependent on that? In other words, is this judgment dependent upon Judge Settle's belief that a person has to be a minor party in order to qualify for this exemption? Well, Judge Settle expressed that this is not a minor party because they very nearly won the election. He said that, but the question is, does it make any difference in what he did? Because it seemed to go on with his opinion, having found minor party, could have quit. He did not find them to be a minor party, but he stated that even if that is not a qualification, that they would still have to meet the reasonable probability standard in showing threats, harassment, and reprisals. He went through each of the witnesses offered, discussed what little was offered by way of testimony, and found that there was not a sufficient amount of harassment. So he was offering alternative rulings that if minor party is a threshold requirement, they didn't meet it, but if it's not, they have not shown threats, harassment, or reprisals. Are you standing on your briefs on the standing question? Yes, but I'd be happy to answer any questions. Well, no, I just wondered. You didn't argue about it, so I was wondering if we're just supposed to look at your briefs or if you had something more to say. It seemed to me that these plaintiffs had standing to bring the facial challenge. I'm having a tough time seeing why they can't bring the as-applied challenge. Well, on an as-applied basis, they need to show that with respect to these referendum petitions that there is an association with the signers, and they had an opportunity to do that at the district court and did not. Well, but just a minute. It seems to me that even under the facial challenge, they have similar type thing, wouldn't they? I think that with respect to the facial challenge where they were claiming that with respect to all petitions, the State's law is unconstitutional and requiring disclosure, the standing was not an issue. Now at the district court, they needed to show with respect to these specific initiatives that they have an associational standing with the signers, and there was no evidence brought to show that they do, that any signers, in fact, share their view that disclosure should not occur. There's one other point I want to note that was discussed during the opening, and that was that the State of Washington inappropriately disclosed the materials and that the district court inappropriately failed to maintain secrecy. And I'd like to point you to S.E.R. 582 in that regard. Would you say S.E.R.? Yes, S.E.R. 582. That's the minute order that the district court issued, and that minute notation said that it was protecting, placing protection that was limited to materials exchanged in discovery, end quote, end quote, not a blanket protection of all orders, end quote. So the district court did not put in place a universal protection or any reason for anyone to expect that when the injunction is lifted, that the State's public record law wouldn't compel the State to immediately disclose. But isn't that because that's the only thing that plaintiffs sought, was the protection of the discovery material? That is all that they sought during the discovery process. The court had indicated that it would take another look at the matter as trial approached. The briefing on summary judgment did not request that in the event, Protect Marriage Washington lost, that the injunction remain in place. During oral argument, they made no such request, and they did not immediately file an injunction. Well, let me ask you a question, though. The list of the R71 petition signers, was that provided by the State to the plaintiffs in discovery? In other words, is it covered by the protective order? The list of the signers was already in the possession of Protect Marriage Washington. What happened when the injunction was lifted was that the State supplied the list, as they were compelled to do by State law, to all of those who had been waiting for two years to receive the material. There's a very heavy statutory penalty on a State agency in Washington if it does not immediately disclose records. And given that these had been sitting there for two years with a court injunction in place, they were compelled to get them out promptly when the court stated that they had to do that. So what are you saying? That the Act was independent of any obligation the State had under the discovery order, or the protective order, or that the protective order had been terminated, or both? One, the protective order was never broad enough to encompass future orders. The protective order stated that it was not a blanket protection on all orders. So there never was any protection from disclosure once the court decided to lift the injunction. The court was not required to guess what sorts of relief Protect Marriage Washington might want and go to them and ask them if they'd like to file a motion. The court acted appropriately. In conclusion, because this case is moot, it is not capable of repetition, it's not one that obeys review, it should be dismissed. And if it is not dismissed, we ask that you uphold the district court order finding that the reasonable probability standard was not met in this case. Okay. Thank you. All right. Thank you. Would you like some rebuttal? No, thank you, Your Honor. He said it all. You know, I had some good buddies in the Marine Corps from Terre Haute, and they're all gone now. So if you'd like a few more minutes, we'll give it to you. Were you on Terre Haute, Mr. Johnson? No, Okinawa. Okinawa? Yeah. My father was assigned there. I was there in the early morning. What'd you say? He said his dad was on Okinawa. How's he doing? He said he was on. Okay. Sorry to hear that. There's another Marine. Shall we adjourn? All you good Marines, and then there's we yippoos who didn't ever, who had a draft number 352. No, we fought to make your life safe. Are we going to adjourn now? Are you going to call an adjournment? Yeah. Okay. This case, the argument in this case is concluded, and the matter is taken under submission. Thank you. Adjourned. Thank you. All rise and report for the session is now adjourned. Thank you.
judges: Pregerson, Tashima, Smith